**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
EL PASO DIVISION**

| | | |
|---|---|---|
| **IVAN MONTES, GUERRERO** | § | |
| **MONTES, and JESUS DOMINGUEZ,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| **v.** | § | **EP-09-CV-82-KC** |
| | § | |
| **THE COUNTY OF EL PASO,** | § | |
| **TEXAS, et al.,** | § | |
| | § | |
| **Defendants.** | § | |

**<u>ORDER</u>**

On this day, the Court considered the motions for summary judgment filed by the
Defendants in the instant case.  *See* Def. Alex Gamboa's Mot. for Summ. J. ("Gamboa S.J.
Mot.") (Doc. No. 79), Def. Noe Juarez's Mot. for Summ. J. ("Juarez S.J. Mot.") (Doc. No. 80),
Defs.' El Paso County, Alex Gamboa, Mario Ramos and Noe Juarez in Their Official Capacity
Mot. for Summ. J. ("County S.J. Mot.") (Doc. No. 81).   For the reasons set forth below, the
motions are **GRANTED** in part and **DENIED** in part.

**I.      BACKGROUND**

**A.      Procedural Posture**

This is a lawsuit alleging excessive use of force by a law enforcement officer.  The
Plaintiffs have alleged that they were mistreated by Defendant Mario Ramos ("Ramos") while he
was acting pursuant to his duties as a deputy constable in El Paso County, and have asserted
various claims under 42 U.S.C. § 1983 against Ramos and the other individual Defendants, who

were allegedly his supervisors. The County of El Paso, Texas, is also named a Defendant, as the entity ultimately responsible for hiring, retaining, supervising and training Ramos. This case is currently before the Court on various motions for summary judgment filed by Defendants. *See* Gamboa S.J. Mot.; *see also* Juarez S.J. Mot., *see also* County S.J. Mot. The usual responses and replies were filed. *See* Pls.' Resp. to Defs. Alex Gamboa and Noe Juarez's Mots. for Summ. J. ("Pls.' Resp. to Gamboa & Juarez Mots.") (Doc. No. 85), Pls.' Resp. to Defs.' County of El Paso, Alex Gamboa, Mario Ramos, and Noe Juarez in Their Official Capacity's Mot. for Summ. J. ("Pls.' Resp. to County Mot.") (Doc. No. 87), Reply of Def. Alex Gamboa, Individually, to Pls.' Resp. to Alex Gamboa and Noe Juarez's Mot. for Summ. J. ("Gamboa Reply") (Doc. No. 88-1), Reply of Def. Noe Juarez, Individually, to Pls.' Resp. to Alex Gamboa and Noe Juarez's Mot. for Summ. J. ("Juarez Reply") (Doc. No. 89-2), Reply of Defs.' County of El Paso, Texas, Alex Gamboa, Mario Ramos and Noe Juarez, in Their Official Capacity's Mot. for Summ. J. ("County Reply") (Doc. No. 91). Also before the Court are several objections to summary judgment evidence, and responses to some of these objections. *See* Pls.' Obj. to Defs.' Alex Gamboa and Noe Juarez's Purported Mot. for Summ. J. Evid. ("Pls.' Evid. Obj. I") (Doc. No. 83), Pls.' Obj. to Defs.' County of El Paso, Alex Gamboa, Mario Ramos and Noe Juarez in Their Official Capacity's Purported Mot. for Summ. J. Evid. ("Pls.' Evid. Obj. II") (Doc. No. 84), El Paso County, Texas, Alex Gamboa, Mario Ramos and Noe Juarez in Their Official Capacities Obj. to Pls.' Evid. Submitted With Pls.' Reply to Defs.' El Paso County, Texas, Alex Gamboa, Mario Ramos and Noe Juarez in Their Official Capacities, Mot. for Summ. J. ("County Evid. Obj.") (Doc. No. 92), Alex Gamboa's, Individually, Obj. to Pls.' Evid. Submitted with Pls.' Reply to Def. Alex Gamboa Individually, Mot. for Summ. J. ("Gamboa Evid. Obj.") (Doc. No.

93-1), Noe Juarez's, Individually, Obj. to Pls.' Evid. Submitted With Pls.' Reply to Def. Noe

Juarez, Individually, Mot. for Summ. J. ("Juarez Evid. Obj.") (Doc. No. 94-1),  El Paso County,

Texas, Alex Gamboa, Mario Ramos and Noe Juarez in Their Official Capacities, Response to

Pls.' Obj. to Defs.' El Paso County, Texas, Alex Gamboa, Mario Ramos and Noe Juarez in Their

Official Capacities Mot. for Summ. J. ("County Resp. to Pls.' Evid. Obj.") (Doc. No. 95), Alex

Gamboa's, Individual, Resp. to Pls.' Obj. to Def. Alex Gamboa Individual, Mot. for Summ. J.

("Gamboa Resp. to Pls.' Evid. Obj.") (Doc. No. 96), Noe Juarez's, Individual, Resp. to Pls.' Obj.

to Def. Noe Juarez's Individual, Mot. for Summ. J. ("Juarez Resp. to Pls.' Evid. Obj.") (Doc. No.

97).  The case has also survived a round of Rule 12(b)(6) motions; qualified immunity was

deemed, at that point, to be no bar to the instant suit against the individual Defendants.  *See*

Order, Jul. 29, 2009 ("12(b)(6) Order") (Doc. No. 58).

     **B.**     **Evidentiary Objections**

     As noted above, the Defendants have challenged certain portions of Plaintiffs' summary

judgment evidence, and the Plaintiffs have challenged some of the Defendants' evidence.

Because the exclusion of evidence could impact the factual narrative of this case, these issues are

addressed first.

     **1.**     **Plaintiffs' Objections**

     Plaintiffs object to the evidence of Border Patrol Agent Daniel O. Vazquez ("Agent

Vazquez") and the expert witness report of Vincent S. Pokluda ("Pokluda").  *See* Pls.' Evid. Obj.

I; *see also* Pls.' Evid. Obj. II.[1]  Defendants have responded to these objections.  *See* County Resp.

---

[1]     Plaintiffs filed separate objections in response to the separate
Motions for Summary Judgment filed by the various groups of
defendants in this case.  Due to the considerable degree of

to Pls.' Evid. Obj.; *see also* Gamboa Resp. to Pls.' Evid. Obj.; *see also* Juarez Resp. to Pls.'

Evid. Obj.  These objections, and the relevant responses, will be discussed below in turn.

### a.    Agent Vazquez's evidence

Regarding Agent Vazquez, Plaintiffs object to the admission of his evidence and contend

that Defendants did not disclose his name to them as a potential witness before the applicable

deadlines.  *See* Pls.' Evid Obj. I ¶¶ 2-3.  They also allege that he has not been available for

deposition purposes.  *Id.* ¶ 4.  Defendants respond by arguing that Plaintiffs waived their

objections to the evidence of Agent Vazquez by making reference to his evidence in their

responses to the various motions for summary judgment.  *See* Gamboa Resp. to Pls.' Evid. Obj.;

*see also* Juarez Resp. to Pls.' Evid. Obj.

Defendants cite Federal Rule of Evidence 801 in support of this waiver proposition, but

the purpose of this citation is unclear.  *See* Gamboa Resp. to Pls.' Evid. Obj. 1-2 (citing FED. R.

EVID. 801(d)(2)(B)).  Rule 801 provides that a statement "of which the party has manifested an

adoption or belief in its truth" is to be considered an admission by a party-opponent for the

purposes of the hearsay rule.  *See* FED. R. EVID. 801(d)(2).  The rule has no bearing on the

lodging or waiving of objections to evidence submitted by another party, because objections are

dealt with in Rule 103.  *See* FED. R. EVID. 103.  Merely discussing a piece of evidence introduced

by an opponent does not serve to manifest an adoption of that evidence – an adoption requires

more.  *See*, *e.g.*, *United States v. Morgan*, 581 F.2d 933, 938 (D.C. Cir. 1978) (finding an

adoptive admission of third-party out-of-court statements when a litigation party filed a sworn

overlap between the sets of Objections, these filings are
regarded as interchangeable unless otherwise specifically
noted.

-4-

affidavit characterizing these statements as "reliable").  Indeed, the Court is aware of no rule of evidence which requires a party to ignore evidence to which it has objected; that is, there is no rule against first objecting to the introduction of a piece of evidence, and then discussing its substance while awaiting a court ruling on its admissibility.

Defendants also claim that the Plaintiffs have "had the opportunity to depose Agent Daniel O. Vazquez during the discovery period but chose not to depose the witness."  Gamboa Resp. to Pls.' Evid. Obj. 2.  This bald-faced assertion is contradicted by Plaintiffs' contentions, backed by documentary evidence, that Defendants never disclosed the identity and role of Agent Vazquez at any point during the discovery period.  *See* Pls.' Evid. Obj. I ¶¶ 2-3, Exs. 2-3 (displaying copies of Defendants' initial disclosure statements which list persons with knowledge of the events of this case, Agent Vazquez not listed); *see also* Pls.' Evid Obj. II Ex. 5 (displaying so-called "supplemental" initial disclosure, submitted by Defendants to Plaintiffs on January 26, 2010 – two and a half weeks after the close of discovery – which finally discloses the identity and role of Agent Vazquez).  It is not clear how a party has the opportunity to depose a witness whom he does not know to exist, especially when such ignorance is caused by the failings of the opposing party.

Defendants also go on to argue that "[t]ypically, parties, as in this case, Defendants, do not depose witnesses beneficial to their case."  Gamboa Resp. to Pls.' Evid. Obj. 2.  If Defendants mean to imply that they did not seek to depose Agent Vazquez (and thus would have no reason to believe that the Department of Justice was refusing to make him available to testify, as Plaintiffs contend happened when they finally learned of his identity and tried to depose him), then Defendants are baldly attempting to mislead the Court.  Plaintiffs have already furnished

documentary evidence showing that Defendants *did* attempt to depose Agent Vazquez three times – apparently without success. *See* Pls.' Evid. Obj. I Ex. 4 (showing three Notices of Intent to take Agent Vazquez's deposition, all signed and served by Rosendo "Sandy" Torres, attorney for Defendants).[2]  Unfortunately, Defendants have made no attempt to address or explain this evidence proof.

Notwithstanding all of the foregoing, however, the Court need not address these issues, because even if Agent Vazquez's evidence is admitted for the purposes of the pending motions for summary judgment it would not affect the ultimate disposition of these motions.  If his evidence is excluded, then the only admissible account of the events of the morning of February 28, 2008, is the account submitted by the Plaintiffs, which would not support summary judgment. If Agent Vazquez's evidence is admitted, then factual disputes arise as to what actually happened that morning, which also precludes summary judgment in favor of the Defendants.  Accordingly, the substance of this evidence will be discussed below, as admitting or denying the evidence at this juncture could lead to no error either way.

**b.      Expert witness Pokluda's evidence**

Regarding Pokluda's expert witness report ("Pokluda Report") (Doc. 77-4), Plaintiffs lodge hearsay and unsworn-statement objections, objections due to untimely disclosure, an objection to the relevance of a certain 'Nacadoches incident,' and objections to the arguably

---

[2]      While these Notices of Intent would serve to put the Plaintiffs on some notice of Agent Vazquez's existence, the fact remains that, due to the lack of proper disclosure, there was no way for Plaintiffs to ascertain what his purported knowledge or involvement was, and thus if they should take an interest in deposing him.  The Court, therefore, does not deem these Notices to be adequate disclosures of Agent Vazquez's identity and relevance as a witness.

speculative nature of some of his conclusions. *Id.* ¶¶ 5-7. Regarding the hearsay and unsworn-statement objections, Defendants have supplemented the report with an affidavit signed by Pokluda, affirming the report as his expert testimony. *See* Gamboa's Resp. to Pls.' Evid. Obj. 7. This cures the first defect raised by Plaintiffs.

Defendants do not address Plaintiffs' untimely disclosure objection. But Plaintiffs' apparent contention that disclosures of the documents used by the expert witness should have been made during the course of the initial disclosures is simply incorrect; these items only need to be disclosed when the expert is identified and his or her report submitted. *See* Pls.' Evid. Obj. I ¶ 6 (arguing that the documents used by Pokluda were not included in Defendants' initial disclosures); *see also* FED. R. CIV. P. 26(a)(2) (stating that the information used by the expert witness in forming his or her opinions is to be included in the expert witness written report, which is to accompany the disclosure of the expert's identity). These items were, in fact, submitted with the expert witness report. *See generally* Defs.' Expert Witness Disclosure (Doc. No. 78). The time for making expert witness disclosures does not coincide with the time for making initial disclosures. *See* FED. R. CIV. P. 26(a)(2)(C) (stating that the usual time for making expert witness disclosures for retained experts, including the Rule 26(a)(2) written report containing the information upon which the opinions are based, is ninety days before trial). Accordingly, absent any contention that the entire expert witness disclosure was itself untimely or prejudicial, the Court finds no basis for this objection.

Plaintiffs' objections concerning the allegedly speculative nature of the Pokluda's conclusions regarding the adequacy of Ramos's training are also misplaced. *See* Pls.' Evid. Obj. I ¶ 7 (claiming that "the expert does not know what training [Ramos] has received"). The expert

witness plainly knew what training Ramos had previously received, and he attached documentary evidence to his report showing how he learned of it. *See* Defs.' Expert Witness Disclosure 35-38 (containing a database report from the Texas Commission On Law Enforcement Officer Standards and Education showing the training courses completed by Ramos under the auspices of the Commission). This objection simply has no support.

Plaintiffs claim that the Pokluda Report is conjectural because "the expert . . . does not even know what Mario Ramos's actions were on that day of the incident since Mario Ramos failed to answer questions [at his deposition] and instead asserted his 5th Amendment right against self-incrimination," but this is similarly ill-founded. Pls.' Evid. Obj. I ¶ 7. Pokluda had access to the deposition evidence produced by the other witnesses to the events in question, and he also makes reference to a written report which further documents the events in question. *See* Defs.' Expert Witness Disclosure 7, 10. The Court assumes that the written report referenced is the one prepared by Agent Vazquez, which is included in the expert witness disclosure materials. *Id.* at 61-63. Accordingly, the Court finds that Pokluda had access to enough information about the events in question to render his opinion facially non-speculative and relevant. Finally, in this connection, the Court will not address the relevance of Pokluda's reference to the 'Nacadoches incident,' unless and until this item comes up particularly in the course of arguments.

For the foregoing reasons, the Court overrules the objections to the Pokluda Report for the purposes of considering the summary judgment motions now pending. Particular hearsay issues are addressed if as they arise in the course of the arguments concerning the summary judgment motions.

c.      **Evidence regarding whether Ramos acted lawfully and within the scope of his duties**

Plaintiffs object to Defendants introducing evidence that Ramos was acting lawfully and within the scope of his duties on the morning of February 28, 2008.  *See* Pls.' Evid. Obj. III ¶ 10. This is because the County has elsewhere taken a contrary view.  Specifically, the County justified a decision to stop paying for Ramos's lawyer by contending that Ramos's invocation of his Fifth Amendment privilege at a deposition suggested that "his actions, which [gave] rise to this lawsuit, were outside the parameters of the performance of his public duties."  *Id.* (citing letters from the County Attorney's office which have been filed with the Court).  Plaintiffs, however, cite no rule of evidence stating that a party cannot adopt differing views at different points in time, or that a party cannot bring evidence in support of inconsistent views.  Indeed, the Federal Rules of Civil Procedure explicitly endorse a party's right to assert inconsistent claims and defenses, and Plaintiffs point to no reason why that rule should not apply here.  *See* FED. R. CIV. P. 8(d)(3).  Accordingly, the Court finds that this objection has no basis in law.

2.      **Individual Defendants' objections**

Defendants Gamboa and Juarez have each filed their own set of objections to the evidence employed by the Plaintiffs in responding to the pending motions.  *See* Alex Gamboa's, Individually, Objections to Pls.' Evid. Submitted with Pls.' Reply to Def. Alex Gamboa Individually, Mot. for Summ. J. ("Gamboa Evid. Obj.") (Doc. No. 93-1); *see also* Noe Juarez's, Individually, Objections to Pls.' Evid. Submitted with Pls.' Reply to Def. Noe Juarez,

Individually, Mot. for Summ. J. ("Juarez Evid. Obj.") (Doc. No. 94-1).[3]  Plaintiffs did not respond to these objections.

There was no need.  Having waded through approximately sixty pages of often-incomprehensible gibberish,[4] it is apparent that there are very few objections of any merit contained in these filings.  One particularly unmeritorious series of objections, which constitutes the vast majority of the material filed, involves challenging virtually every assertion contained in Plaintiffs' affidavits as being conclusory and inadmissible hearsay.  For example, Defendants challenge the following statement contained in the affidavit of Plaintiff Ivan Montes:  "Shortly after passing Deputy Ramos, I slowed down and stopped at a stop sign."  Pls.' Resp. to Gamboa & Juarez Mots. Ex. A ¶ 3, Mar. 19, 2010 ("Ivan Aff.") (Doc. No. 85-1).  Defendants' challenge reads as follows:

> DEFENDANT'S RESPONSE:  Defendant incorporates its General Objections as above.  The Affidavit is setting forth unsupported or ultimate or conclusory facts

---

[3]     The observations made in connection with Gamboa's and Juarez's duplicative Responses to Plaintiffs' evidentiary objections apply with equal or greater force to these two filings.  These two documents are interchangeable for all purposes.

[4]     For example:  "DEFENDANT'S RESPONSE: Defendant incorporates its General Objections as above.  To the extent that Plaintiffs attempt use the fact of deputy constable pleading the Fifth, use of the deposition in jumping to this conclusion constitutes hearsay under F.R.E. 801 and 802 as they are offered for the truth of the matter asserted in which the Plaintiffs try to connect up the dots to allegations regarding Constable Gamboa' failure to train with an event that involves deputy constable Ramos pleading the Fifth Amendment.  Additionally, Defendants would assert under F.R.C.P. 32(a)(6) that the entire deposition be considered in fairness to Defendants."  Gamboa Evid. Obj. 23.  However, after inviting the Court to examine the whole of the deposition in question, Defendants fail to supply the Court with a copy of it for the purposes of such a review..

and is insufficient.  Affidavits setting forth ultimate or conclusory facts and conclusions of law are insufficient to either support or defeat a motion for summary judgment. [Citations omitted.]  There is no supporting document attached to or reference which sets forth whether the incident occurred as relayed by Defendant Ivan Montes.  Additionally, it constitutes hearsay under F.R.E. 801 and 802 as they are offered for the truth of the matter asserted.

Gamboa Evid. Obj. 6.

How the statement "I slowed down and stopped at a stop sign" could possibly be an "ultimate or conclusory fact" in an excessive force lawsuit is beyond comprehension.  Rather, it seems to be the opposite of an ultimate fact or conclusory statement.  *See Reese v. Anderson*, 926 F.2d 494, 499 (5th Cir. 1991) ("What is needed in an affidavit of this sort are facts, reasons, observations and explanations – in a word, *evidence* – not sweeping conclusions.").  The Court finds "I slowed down and stopped at a stop sign" to be a prime example of a specific fact or observation, which makes it precisely the sort of thing that the Fifth Circuit has ruled should be included such affidavits.

The hearsay contention is equally meritless.  Affidavits are within "the core class of testimonial statements that a witness can provide." *United States v. Rose*, 587 F.3d 695, 700 (5th Cir. 2009).  Affidavits are explicitly admissible on summary judgment.  *See* FED. R. CIV. P. 56(e).  An affidavit does not contain embedded hearsay if it relates facts within the affiant's personal experience or observations.  *Cf. United States v. $92,203.00 in U.S. Currency*, 537 F.3d 504, 508 (5th Cir. 2008).  As a direct statement from a witness, there is no need to attach a "supporting document" to a sworn affidavit, as Defendants argue.  Gamboa Evid. Obj. 6.  Indeed, as Defendants themselves admit, sworn affidavits themselves constitute supporting documents which permit the introduction of other pieces of evidence.  *See* Gamboa's Resp. to Pls.' Evid. Obj. 7.

The one series of objections that has some merit are the challenges to the admissibility of evidence concerning separate alleged acts of brutality committed by Ramos against other victims. Still, separating the wheat from the chaff is difficult because Defendants include a number of fanciful or pointless objections even in this context.  For instance, Defendants take issue with the following statement contained in the affidavit of Eric Villalobos, who is one of the other purported victims of Ramos:  "The patrol car parked behind my vehicle.  Immediately another patrol vehicle traveling at a high rate of speed pulled up on the left hand (driver's) side of my vehicle.  Mario Ramos was driving the second vehicle."  Pls.' Resp. to Gamboa & Juarez Mots. Ex. E ("Villalobos Aff.") (Doc. No. 85-1).  Defendants argue, inter alia, that "[t]his statement constitutes hearsay under F.R.E. 801 and 802 as they [sic] are offered for the truth of the matter asserted."  Gamboa Evid. Obj. 18-19.  As explained above, there is no way that such a statement of personal observations could be construed as hearsay.

The objections that do have merit in this context concern the potential for prejudice and the potential that this evidence would be used as propensity evidence; that is, to prove that Ramos "acted in conformity with his character on a particular occasion."  Gamboa Evid. Obj. 19-20.  The Court will refrain from addressing the question of undue prejudice until trial.  The Court also finds that evidence of prior bad acts or accusations is not admissible to prove that Ramos acted in conformity with his character, but that it is admissible for other purposes, such as proving that the other Defendants had *notice* of Ramos's propensities.  *See* FED. R. EVID. 404(d) (stating that, while character evidence may not be used to prove that a person acted in conformity with a particular trait on a particular occasion, it may be introduced for "other purposes, such as proof of . . . knowledge").  That is, this sort of evidence may be used to show that some

-12-

Defendants knew of or should have known of these bad acts or accusations and did not respond reasonably to them when deciding whether to hire and retain Ramos and how to supervise and train him.

While this type of evidence is categorically admissible for the purposes of proving notice, not all the evidence submitted by Plaintiffs is admissible under this theory.  Notably, the evidence submitted by the Plaintiffs concerning Ramos's alleged rape of Lilian Martinez and his alleged shooting of Juan Antonio Ortegon is inadmissible.  *See* Pls.' Resp. to Gamboa & Juarez Mots. Exs. H, I, J (indictments and affidavits detailing the alleged rape and shooting).  This is because these episodes allegedly occurred *after* February 28, 2008 – the date of the episode complained of in the instant lawsuit – and thus could not have been expected to influence any decisions hire, retain, train or supervise Ramos up to that time.  Accordingly, the Court will not consider these this evidence when deciding the instant motions.

### 3.    County Defendant objections

The County, and the Defendants sued in their official capacities, also submitted objections to the evidence filed by the Plaintiffs.  *See* El Paso County, Texas, Alex Gamboa, Mario Ramos and Noe Juarez in their Official Capacities Objections to Pls.' Evid. Submitted With Pls.' Reply to Defs. El Paso County, Texas, Alex Gamboa, Mario Ramos and Noe Juarez in their Official Capacities, Mot. for Summ. J. ("County Evid. Obj.") (Doc. No. 92).  While this document has some slight differences when compared with the two individual-capacity evidentiary objections discussed above, in form and substance it is substantially the same, so the discussion above is incorporated by reference as to all the overlapping issues.

There are two new points raised in this filing that require attention.  First, the County objects to the filing of a copy of a Fox News report dated December 18, 2008, on the grounds that it is hearsay.  County Evid. Obj. § J.  The County is correct in stating that any use of this article to try to prove the substantive facts within it would be impermissible.  *See generally* FED. R. EVID. 801, 802.  But Plaintiffs may use these sorts of items for other purposes which do not constitute hearsay – for example, to show that Defendants were on notice concerning Ramos's violent tendencies.  *See* FED. R. EVID. 801(c) (stating that hearsay is an out-of-court statement "offered in evidence to prove the truth of the matter asserted").  However, this particular news article was published on December 18, 2008, over nine and a half months after the events of February 28, 2008.  Accordingly, like the alleged rape of Lilian Martinez by Ramos, and like his alleged shooting of Juan Antonio Ortegon, this article is too late in time to prove directly that Defendants should have been on notice concerning Ramos before the incident at issue in this suit.  Accordingly, the Court will not consider this particular news article when analyzing the arguments for summary judgment.

The second point is the County's objection to Plaintiffs' reliance on the testimony of Angel Ramirez ("Ramirez") as non-retained expert testimony, as his qualifications have not been adequately established by the Plaintiffs.  *See* County Evid. Obj. § M.  While qualifying Angel Ramirez as an expert may be desirable for the trial stages of this case, the Court finds that it can adequately address the pending motions without having to rely on Ramirez's testimony in an expert capacity – his basic fact testimony alone is enough for present purposes.  Accordingly, the Court will not rule on this objection at this time.

### 4.        Conclusions regarding admissibility of evidence

For the reasons set forth above, certain objections are sustained for the purposes of this Order, while others will be held in abeyance until particular facts or episodes are discussed in detail, and finally still others should be overruled.  A summary of the dispositions of the various objections is appended below.

### a.    Plaintiffs' objections

Plaintiffs' objections to the evidence of Agent Vazquez are **OVERRULED AS MOOT** for the purposes of analyzing the summary judgment motions, as including or excluding this evidence does not change the disposition of the pending motions.

Plaintiffs' objections to the expert evidence of Pokluda are **OVERRULED** in part and **HELD IN ABEYANCE** in part.  The Court holds that his report is admissible, because there are no valid objections as to the timeliness of any disclosures, the factual basis of the report, or the certification of the report.  Objections to embedded hearsay will be dealt with as they arise.

Plaintiffs' objections to evidence concerning whether Ramos acted within the scope of his duties on the morning of February 28, 2008, are **OVERRULED**, because there is no ascertainable basis for prohibiting conflicting theories, especially when each conflicting theory is used against a different party.

### b.    Individual Defendant objections

These objections are **OVERRULED** *en masse* because they are largely incomprehensible and without merit, except that the objections to evidence of any misdeeds allegedly committed by Ramos after February 28, 2008, are **SUSTAINED**.  While evidence of earlier misdeeds may prove notice, evidence of later misdeeds cannot serve this legitimate purpose.

### c.    County objections

Most of the County's objections are as spurious as the objections lodged by the individual Defendants and are therefore **OVERRULED**.  However, the Court **SUSTAINS** the objection to the Fox News article submitted by the Plaintiff because its direct use would be hearsay, and because it cannot serve to prove notice as it was published too late in time.  The Court **OVERRULES AS MOOT** the objections to Ramirez's expert qualifications, as the Court will not consider his testimony in an expert capacity at this juncture.

### C.     The Incident on the Morning of February 28, 2008.

The version of the facts set forth below is taken from the evidence on record, viewed in the light most favorable to the non-moving party, as is appropriate on summary judgment.  *See Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc).  The three Plaintiffs in this case have each provided their own eyewitness testimony to the events of the morning of February 28,2008.  Ramos refused to provide any testimony regarding these events, invoking his Fifth Amendment privilege against self-incrimination.  *See* Mario Ramos Dep. ("Ramos Dep.") 48:13-71:6, Nov. 9, 2009 (Doc. No. 87-3).  The only other eyewitness is Agent Vazquez, who happened upon the incident while it was unfolding.  He provided a sworn Declaration, which was entered into evidence by the defense.  *See* Decl. of Daniel O. Vazquez ("Vazquez Decl."), Jan. 28, 2010 (Doc. No. 77-3).  As noted above, the Plaintiffs have objected to his evidence.  The Court will incorporate his version of the facts, though, as doing so only serves to raise issues of material fact, which is a circumstance that favors the denial of summary judgment – the result that would obtain even if his evidence were not included.

On the morning of February 28, 2008, Ivan Montes ("Ivan") was driving a pickup truck in El Paso County, Texas.  Ivan Aff. ¶2.  He had two passengers in the truck with him – his father,

Guerrero Montes ("Guerrero"), who was sitting in the back seat, and a family friend, Jesus

Dominguez ("Dominguez"), who was sitting in the front passenger seat. *Id.* At approximately

9:30 a.m., in the vicinity of the 300 block of San Elizario Road, Ivan's truck passed a patrol car

being driven in the opposite direction by deputy constable Ramos. *Id.* ¶ 3. A short time later,

Ivan's truck reached Alameda Avenue, and Ivan turned right and began traveling west. *Id.* ¶ 4.

Ramos's patrol car then approached Ivan's truck from behind. *Id.* Ramos turned on his flashing

lights and stopped Ivan's truck near the 12000 block of Alameda. *Id.* There is no admissible

evidence that this traffic stop was supported by probable cause. *Id.* ("I had not broken any traffic

law or done anything else wrong.").[5]  Ramos got out of his vehicle, approached the pickup truck,

---

[5]         Some Defendants argue that this traffic stop was justified by
alleged traffic violations committed by Ivan. *See, e.g.,*
Gamboa S.J. Mot. ¶ 2 ("In order to avoid a potential collision
with Plaintiffs' vehicle, Defendant Ramos pulled off to the
side of the road. Defendant Ramos then observed the
Plaintiffs run through a stop sign."). But there is no testimony
on file from any witnesses to support this contention, and mere
assertion in a pleading is not enough. *See* Ramos Dep. 50:13-
17 ("Q. . . . Why did you stop the vehicle that Ivan Montes,
Guerrero Montes and Jesus Dominguez was [sic] driving? A.
On the advice of my attorney, I'd like to plead the Fifth
Amendment.").

The Pokluda report states that Ramos did observe certain traffic violations that
morning. *See* Pokluda Report 4 ("Mario Ramos felt that the actions of Ivan
Montes met the requirements for the offense of reckless driving. . . ."). But this
appears to be hearsay, as the expert bases his statement on certain reports that he
had reviewed. *Id.* ("[T]he information contained in reports state that Mario
Ramos observed a violation of the Texas Transportation Code. In his complaint
to the magistrate, [Ramos] characterized the violation as *Reckless Driving* for
which the magistrate of JP6 issued warrant M6208-0033 for Ivan Montes
(appendix J)."). There is no admissible documentary evidence of Ivan's alleged
traffic infractions, as the "appendix J" to which Pokluda cites does not even
contain the documents he claims it contains. Instead, that appendix contains a
printout of a webpage which describes certain charges made against Guerrero
Montes – not Ivan Montes. *See* Pokluda Report App. J. As such, the Court
concludes that there is no admissible evidence on record supporting the
proposition that Ivan committed a traffic infraction.

and ordered Ivan to step out of the truck and come towards the patrol car, while the other passengers were to remain in the truck.  *Id.*  Ivan complied.  *Id.*

Ramos then allegedly administered to Ivan a savage and unprovoked beating.  *Id.* ¶¶ 5-7 ("Deputy Ramos then struck me, knocking me to the ground. . . [he] began to kick my right arm violently, as if trying to break it. . . . [He] began to punch me while continuing to kick me. . . . [He] then raised my head up by grabbing my collar, and then bashed my face repeatedly against the pavement.  In extreme pain and in fear of my life, I eventually blacked out. . . . At no point did I hit or attempt to hit Deputy Ramos or try to fight back as he physically assaulted me.").  Dominguez, having observed the proceedings from inside the truck's cab, told Guerrero what was happening.  Guerrero Montes Dep. 43:4-12, Oct. 27, 2009 ("Guerrero Dep.") (Doc. No. 77-3).  Guerrero then got out of the truck and asked Ramos to stop beating his son.  *Id.* at 43:13-23.  In response, Ramos drew his gun on Guerrero.  *Id.* at 47:8-17.  Dominguez, who had also exited the truck during the fracas, was thrown to the ground and handcuffed.  Jesus Dominguez Dep. 27:10-23, Oct. 27, 2009 ("Dominguez Dep.") (Doc. No. 87-3).  During these events, Agent Vazquez arrived on the scene, and then so did numerous other police officers.  *Id.* at 24:20-25:21.  Ivan, Guerrero and Dominguez were arrested and charged with various criminal offenses, but all charges were later dropped.  *See* Ivan Aff. ¶ 9; *see also* Aff. of Jesus Dominguez ¶ 6 ("Dominguez Aff.") (Doc. No. 87-1).  Ivan required hospital treatment for the injuries he suffered at the hands of Ramos.  *See* Ivan Aff. ¶ 9.

Agent Vazquez's version of the events differs on several important points.  He states that, while driving past Ivan's stopped truck, he saw "Ivan Montes become aggressively resistant to Deputy Constable Ramos which resulted in a physical confrontation."  Vazquez Decl. ¶ 7.  After

stopping and stepping out of his vehicle, Agent Vazquez reports seeing "Ivan Montes trying to strike Deputy Constable Ramos with his fists." *Id.* ¶ 9. He also reports seeing Guerrero Montes grab Ramos by the collar. *Id.* ¶ 11. He also claims that it was he who drew his gun during the course of these events, not Ramos. *Id.* ¶ 17.

## II.   DISCUSSION

### A.   Standard

Summary judgment is required "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Warfield v. Byron*, 436 F.3d 551, 557 (5th Cir. 2006). The substantive law identifies which facts are material. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Ellison v. Software Spectrum, Inc.*, 85 F.3d 187, 189 (5th Cir. 1996). A dispute about a material fact is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *Ellison*, 85 F.3d at 189.

"[The] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323; *Wallace v. Texas Tech. Univ.*, 80 F.3d 1042, 1046-1047 (5th Cir. 1996). If the moving party meets its initial burden, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e). The nonmovant's burden may not be satisfied by "conclusory allegations, unsubstantiated assertions, or only a scintilla of

evidence." *Warfield*, 436 F.3d at 557 (quoting *Freeman v. Texas Dep't of Crim. Justice*, 369

F.3d 854, 860 (5th Cir. 2004)).  Factual controversies are to be resolved in favor of the

nonmovant, "but only when there is an actual controversy, that is, when both parties have

submitted evidence of contradictory facts." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th

Cir. 1994) (en banc).  Thus, the ultimate inquiry in a summary judgment motion is "whether the

evidence presents a sufficient disagreement to require submission to a jury or whether it is so

one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52.

### B.    Arguments of the County

The County and the individual Defendants in their official capacities present a number of

arguments in favor of a grant of summary judgment.[6]  *See generally* County S.J. Mot.  These

arguments will be discussed below.  The Court finds most of them unavailing, but it grants

summary judgment in the County's favor on the failure-to-train theory.

### 1.    Sovereign Immunity

The County first tries to avoid Plaintiffs' claims by invoking the doctrine of sovereign

immunity.  *See* County S.J. Mot. ¶¶ 6-7 (displaying the words "Sovereign Immunity" in boldface,

underlined letters).  Sovereign immunity, however, does not apply to local government entities.

*See Alden v. Maine*, 527 U.S. 706, 756 (1999).  According to the Fifth Circuit, sovereign

immunity "does not, as a general rule, extend to counties," and "no exception should be made to

this rule without convincing evidence distinguishing the county in question from counties

---

[6]           A suit against local government officials in their official
capacities is functionally a suit against the local government
entity itself.  *See Skelton v. Camp*, 234 F.3d 292, 296 (5th Cir.
2000).  Accordingly, all references in this connection will
simply be to the County itself.

generally." *United Disaster Response, LLC v. Omni Pinnacle, LLC*, 511 F.3d 476, 479 (5th Cir. 2007) (citing Crane v. Tex., 759 F.2d 412 (5th Cir.), *amended in part on denial of reh'g*, 766 F.2d 193 (5th Cir. 1985)).  El Paso County advances no argument distinguishing it from counties in general; therefore, the Court concludes that sovereign immunity does not shield El Paso County from Plaintiff's claims in the instant case.  The County is not entitled to summary judgment on this ground.

The County proceeds to make what appears to be a motion to dismiss argument, attacking the sufficiency of the Plaintiffs' § 1983 pleadings.  *See* County S.J. Mot. ¶ 7 ("Beyond Plaintiffs' mere conclusory allegations, Plaintiffs' Second Amended Complaint alleges no facts that tend to show that the asserted deprivation of Plaintiffs constitutionally protected rights was the result of an official policy of custom of the County Defendants.").  In fact, the County made just such an argument at the motion-to-dismiss stage, which was duly rejected by this Court.  *See* Defs.' County of El Paso, Alex Gamboa, Mario Ramos and Noe Juarez, in their Official Capacity, First Amended Mot. to Dismiss Pursuant to Fed. R. Civ. P. 12(B)(6) ("County 12(b)(6) Mot.") ¶ 14 (Doc. No. 33) ("Plaintiffs fail to cite to a policy or policies, that are either illegal or the moving force to any violation of any protected right); *see also* 12(b)(6) Order 17-18 (holding that Plaintiffs' pleadings adequately alleged a cause of action, notwithstanding County's arguments to the contrary).  After attacking the sufficiency of the pleadings, the County goes on to argue that "the summary judgment evidence contained in the Exhibits of this motion establishes that the policies and procedures in place at the time of incident [sic] are directly contrary to the allegations contained in Plaintiffs' Second Amended Complaint."  County S.J. Mot. ¶ 7.  But, the County does not specify which pieces of evidence contained in the more than 130 pages of

attachments filed with their Motion would support this argument, despite the requirement that the moving party "identify[] those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323.  A conclusory wave of the hand in the direction of a stack of documents just won't do, and upon its own review, the Court is unable to ascertain what evidence on the record, if any, supports the County's contentions.  The Court therefore concludes that the County is not entitled to summary judgment on this basis.

### 2.    Fourth Amendment violations

The alleged Fourth Amendment violations committed by Ramos against Plaintiffs are at the heart of this suit.  If Ramos's conduct indeed violated Plaintiffs' rights, then he would be personally liable under § 1983.  *See Peterson*, 588 F.3d at 842-43.  The County could also be held liable if Plaintiffs can prove that the County was a "moving force" in bringing about a violation that was personally committed by Ramos.[7]  *Id.*  Thus, if the County can show, beyond factual dispute, that no Fourth Amendment violation took place, then all of Plaintiffs' claims would be defeated on summary judgment.

Plaintiffs have alleged at least three discrete violations of the Fourth Amendment:  (1) Excessive use of force; (2) unreasonable seizure of the person; and (3) unlawful arrest.  Pls.' Second Am. Compl. ¶ 23.  Making reference to the factual background recited above, "excessive use of force" would refer to the allegedly unwarranted beating administered to Ivan after the traffic stop and potentially to any use of force against the other Plaintiffs at that point.  "Unreasonable seizure of the person" would refer to the alleged lack of justification for Ramos to

---

[7]            The requirements for showing that the County was a "moving force" are discussed below in subsection 4.

effect the traffic stop in the first place.  "Unlawful arrest" would refer to the arrests that Ramos

effected or caused to be effected on all three Plaintiffs at the end of the episode in question, also

allegedly without legal justification.  As discussed below, the Court concludes that the County

has not shown that the evidence in this case forecloses any of these purported violations.

### a.    Unreasonable seizure of persons

The County addresses the propriety of the traffic stop first.  It argues that Ramos

"conducted an appropriate traffic stop."  County S.J. Mot. ¶ 9.  For a traffic stop, even one of

limited scope and duration, to be appropriate under the Fourth Amendment, the officer

conducting the stop must have at least a "reasonable and articulable suspicion that a person has

committed or is about to commit a crime" or traffic offense.  *See United States v. Jones*, 234 F.3d

234, 239 (5th Cir. 2000).[8]  The County points to no admissible evidence showing what perceived

offense provided Ramos justification for this traffic stop.  Moreover, Plaintiffs supply affirmative

evidence, containing some detail, showing that the driver committed no traffic violations at the

time of the stop, and that there was no other apparent justification for the stop.  Pls.' Resp. to

County S.J. Mot. ¶ 8 (citing deposition and affidavit evidence).  Thus, there is no genuine issue

---

[8]        The County seems to argue that there is some uncertainty
regarding whether a traffic stop constitutes a "seizure" under
the Fourth Amendment.  County S.J. Mot. ¶ 9 ("Assuming the
Court is willing to entertain the idea that a traffic stop
constituted a seizure as defined by the Fourth Amendment
. . .").  There is no uncertainty under the law regarding this
question.  Traffic stops are "seizures" covered by the Fourth
Amendment:  "[S]topping an automobile and detaining its
occupants constitute a 'seizure' within the meaning of [the
Fourth and Fourteenth] Amendments, even though the purpose
of the stop is limited and the resulting detention quite brief."
*Delaware v. Prouse*, 440 U.S. 648, 653 (1979).  The Fifth
Circuit has consistently applied this holding.  *See United
States v. Shabazz*, 993 F.2d 431, 434 (5th Cir. 1993); *see also
Jones*, 234 F.3d at 239.

of material fact regarding the propriety of the stop – as all available evidence suggests it was *improper*. Even if the County possesses some evidence, overlooked at this point, which supports the contention that there was justification for the stop, this would only serve to create an issue of fact as to the stop's propriety. It would not settle the matter against the Plaintiffs. Either possibility renders summary judgment in favor of the County inappropriate.

### b.      Excessive use of force

The County moves on to argue that Ramos did not use excessive force against any of the Plaintiffs after the traffic stop had been initiated.[9] *See* County S.J. Mot. ¶¶ 8-10. The County acknowledges that force was used by Ramos against the Plaintiffs, but it argues that it was appropriate under the circumstances. *See id.* ¶ 11 ("He saw Plaintiff Ivan Montes trying to strike Defendant Ramos with his fists. . . . Defendant Ramos acted in a manner which was objectively reasonable . . . ."). But there is ample evidence contradicting the notion that Ramos's use of force was justified or reasonable under the circumstances. *See* Pls.' Resp. to County S.J. Mot. ¶¶ 13-14 (citing affidavit and deposition testimony). Plaintiffs demonstrate how several of the key facts which the County cites to justify the use of force are disputed. *Id.*

First, the County's evidence that Ivan was "aggressively resistant" to Ramos is contradicted by evidence which states that Ivan did not attempt to strike Ramos or act disobediently towards him. *Compare* Vazquez Decl. ¶ 7 *with* Ivan Aff. ¶ 7. Second, the County's evidence that Ivan attempted to strike Defendant Ramos with his fists is contradicted by

---

[9]        The use of excessive force by police officers when effecting a traffic stop or arrest is unquestionably a violation of the Fourth Amendment, which is made actionable by 42 U.S.C. § 1983. *See Bd. of County Comm'rs of Bryan County v. Brown*, 520 U.S. 403, 401-02 (1997).

evidence that Ivan never attempted to do so.  *Compare* Vazquez Decl. ¶ 9 *with* Ivan Dep. 47:6-

10.  Third, the County's evidence that Guerrero grabbed Ramos by his collar is contradicted by

evidence that Guerrero never reached Ramos and only addressed him from a distance.  *Compare*

Vazquez Decl. ¶ 11 *with* Guerrero Dep. 48:15-20 *and* Dominguez Dep. 26:25-27:9.  Fourth, the

County's evidence that Guerrero and Dominguez advanced on Ramos "in an aggressive manner

with their hands in a grabbing stance" is contradicted by evidence that neither of these

individuals ever attempted to approach Ramos in an aggressive manner.  *Compare* Vazquez

Decl. ¶ 16 *with* Dominguez Dep. 26:25-27:9 and Dominguez Aff. ¶ 5.  Fifth, there is some

dispute about whether it was Ramos or Agent Vazquez who drew a gun in the course of this

episode.  *See* Pls.' Resp. to County S.J. Mot. ¶ 14.

It is not the Court's task, at the summary judgment stage, to choose between these

competing versions of events, because summary judgment is only appropriate if there is no

genuine issue of material fact.  *See* FED. R. CIV. P. 56.  Here, there are genuine issues as to the

material facts surrounding whether Ramos was justified in using the force that he used, which is

the question at the heart of this alleged Fourth Amendment violation.  Accordingly, summary

judgment in favor of the County is denied on this point.

### c.    Unlawful arrest

The County argues that Ramos's arrest of the Plaintiffs was justified and lawful in light of

the "melee" discussed above.  County S.J. Mot. ¶13.  Indeed, "a warrantless arrest by a law

officer" must be supported by "probable cause to believe that a criminal offense has been or is

being committed" in order to conform with the Fourth Amendment.  *Devenpeck v. Alford*, 543

U.S. 146, 152 (2004).  In this case, the offenses allegedly committed by the various Plaintiffs

included felony assault on a peace officer, reckless driving, resisting arrest and interference with public duties.  *See* Pls.' Second Am. Compl. ¶ 10.  Whether the events of the melee discussed above actually provided probable cause to make arrests on these charges, or any set of charges, depends on whose version of events one believes.  *See Devenpeck*, 543 U.S. at 594 (holding that facts known to the officer must support probable cause that *some* offense was being or had been committed, without regard to the charge actually recited by the officer when making the arrest or any other elements of the officer's subjective intent when making the arrest).

If the Plaintiffs' version of events is true, and no traffic offense was committed or physical resistance offered to Ramos, then there is no probable cause for any arrests.  If Defendants' version of events is true – if the Plaintiffs offered various forms of resistance after their pickup truck was stopped – then there is quite plausibly some basis for arrests sounding in assault or interference.[10]  Defendants also argue that a knife was later found in Ivan's pocket – though they never argue that he tried to withdraw it or use it at any point – but the portion of the evidentiary record they cite to support this assertion contains no reference to any knife.  *See* County S.J. Mot. ¶ 11-*bis*[11] (citing Ivan Dep. 36:1-25).  Again, because it is not the Court's

---

[10]      Defendants submit no admissible evidence concerning whether a traffic offense was actually committed by Ivan while driving the pickup truck.  The Vazquez Declaration only includes events that took place after the truck was already stopped.  *See* Vazquez Decl. ¶ 4.  Defendant Ramos invoked his Fifth Amendment privilege at his deposition, and thus did not provide testimony concerning the nature of the alleged traffic violation at issue.  *See* Ramos Dep. 54:11-25.  Accordingly, there is nothing before the Court supporting probable cause for an arrest on the charge of reckless driving.

[11]      The Motion actually contains two paragraphs in a row labeled "11."  This citation is to the second such paragraph.  *See* County S.J. Mot. ¶¶ 11.

position to choose between competing versions of events when each version is backed by some

evidence, summary judgment is denied and the issue reserved for trial.

### 3.  Fourteenth Amendment arguments

The County argues that Plaintiffs have no claims arising out of direct violations of the

Fourteenth Amendment's Due Process Clause, because excessive force claims are actionable as

violations of the Fourth Amendment instead.  *See* County S.J. Mot. ¶¶ 14-15.  The only relevance

of the Fourteenth Amendment in this context is that it is the vehicle through which Fourth

Amendment rights are made enforceable against the states, as opposed to the federal government

alone; it does not create an independent cause of action here.  *See id.*  The County is correct as a

matter of law.  *See Graham v. Connor*, 490 U.S. 386, 394 (1989).  However, it is not clear that

the Plaintiffs are attempting to allege a set of discrete Fourteenth Amendment Due Process

claims.  *See* Pls.' Second Am. Compl. ¶ 23 (reciting the Fourth Amendment theories of excessive

use of force, unreasonable seizure of the person, and unlawful arrest, after invoking the

Fourteenth Amendment).  Accordingly, the Court holds, for the purposes of this case, that

Plaintiffs have no independent Fourteenth Amendment claims.

### 4.  Municipal liability

The County points out that a local government entity cannot be held liable for the

misdeeds of its employees, in a § 1983 action, on a simple theory of respondeat superior.  County

S.J. Mot. ¶ 18.  Instead, the County argues that the local government must have done something

more substantial to bring about the harm before it can be held liable for any deprivations of

federally-protected rights committed by its employees.  *Id.* ¶ 17.  The County is correct; without

something more, only the offending employees themselves may be held liable in their individual capacities under § 1983.  *See Alton v. Tex. A&M Univ.*, 168 F.3d 196, 200 (5th Cir. 1999).

To establish the heightened degree of involvement required for municipal liability, the Court employs a multi-stage test.  First, a plaintiff must show that the deprivation of federally guaranteed rights was "inflicted pursuant to official custom or policy."  *Piotrowski v. City of Houston*, 237 F.3d 567, 579 (5th Cir. 2001).  This "custom or policy" may either be an explicitly promulgated policy or a "persistent, widespread practice of City officials or employees, which, although not [officially] authorized[,] . . . is so common and well-settled as to constitute a custom that fairly represents municipal policy."  *Id.* (citing *Bd. of County Comm'rs of Bryan County v. Brown*, 520 U.S. 383, 405-07 (1997)).  When a "custom" is proved by reference to a pattern of conduct, a plaintiff must also show that the relevant municipal policy-makers had actual or constructive knowledge of the custom.  *See Pineda v. City of Houston*, 291 F.3d 325, 329-31 (5th Cir. 2002).[12]  Both facially unconstitutional policies and facially innocuous policies support liability, but, in the latter case, only if the facially innocuous policy was "promulgated with

---

[12]        In this connection, the County argues that "Plaintiffs need to demonstrate that the final policy makers had constructive knowledge. . . . Ultimately, Constable Gamboa and Deputy Constable Juarez were not policy makers and did not have constructive knowledge.  County S.J. Mot. ¶ 19.  The County misses the point.  Constructive knowledge need only be demonstrated in cases where a plaintiff alleges that a widespread custom among low-level government employees, which the policy makers tolerated or turned a blind eye towards, led to an infringement on federally-protected rights.  *See Pineda*, 291 F.3d at 329-31.  To the extent that affirmative acts or decisions of the policy makers themselves are implicated, there is no need to prove knowledge specially.  To the extent that Defendants Gamboa and Juarez themselves were not policy makers, and a "custom" is at issue, then *their* constructive knowledge is not at issue, despite what the County thinks.  Instead, what is at issue is the constructive knowledge of the higher echelon.

deliberate indifference to the 'known or obvious consequences' that constitutional violations would result." *Piotrowski*, 237 F.3d at 579 (citing *Bryan County*, 520 U.S. at 407) (stating further the "deliberate indifference" standard is more stringent than simple or heightened negligence).

For the second stage, a plaintiff must show that there was a causal link between the policy or custom and the deprivation of rights at issue. *Id.* at 580. This causal link has also been described as the need to show that the policy at issue was a "moving force" behind the harms that befell the plaintiff. *Id.* (citing *Monell v. New York City Dep't of Social Servs.*, 436 U.S. 658, 694 (1978)). If a policy has a "known or obvious" consequence of infringing on federally protected rights – a finding that the first stage sometimes compels – it is difficult to see how it could fail to be a "moving force" behind these known or obvious harms when they finally come to fruition – as the second stage requires. *See Bryan County*, 520 U.S. 409-10 ("The high degree of predictability may also support an inference of causation – that the municipality's indifference led directly to the very consequence that was so predictable.").

The County, at this stage, makes several desultory, vague and conclusory arguments that "Plaintiff's [sic] global allegations alone are insufficient to establish a claim under § 1983. Specifically, Plaintiffs' [sic] alleges [sic] no facts that tend to show that the asserted deprivation of their constitutionally protected rights was the result of an official policy or custom of County Defendants that was the 'moving force' resulting in a deprivation of their constitutional rights." County S.J. Mot. ¶ 17. Similarly, the County argues that "Plaintiffs have merely stated vague unsubstantiated allegations of customs, policies and practices and failed to establish even a mere scintilla of a link that would constitute the 'moving force' which allegedly caused the

constitutional deprivation." *Id.* ¶ 18.  These bafflingly written motion-to-dismiss-type arguments have already been considered and rejected by the Court.  *See* County 12(b)(6) Mot. ¶ 14 ("Plaintiffs cannot establish that Defendants' conduct is the 'moving force' behind their alleged constitutional injuries.  Plaintiffs fail to cite to a policy or policies, that are either illegal or the moving force to any violation of any protected right."); *see also* 12(b)(6) Order (finding that the County's customs and policies could "plausibly be regarded as the 'moving force' behind Plaintiffs' injur[ies].").  Accordingly, the Court rejects these arguments again and moves on to consider the evidence submitted concerning the various particular theories under which Plaintiffs try to establish that an adopted custom or policy of the County was a moving force behind the harms they suffered.

### 5.    Failure to train, supervise or discipline

The County argues that it is entitled to summary judgment in its favor on the failure to train and failure to supervise or discipline theories liability put forward by Plaintiffs.  County S.J. Mot. ¶¶ 20-25.  The Court has previously addressed the required elements of a § 1983 claim sounding in failure to train and supervise and found that they were adequately set forth in Plaintiffs' pleadings.  *See* 12(b)(6) Order 14-15.  These elements are (1) the supervisor either failed to supervise or train the subordinate official; (2) a causal link exists between the failure to train or supervise and the violation of plaintiff's rights; and (3) the failure to train or supervise amounts to deliberate indifference.  *Id.* (citing *Brumfield v. Hollins*, 551 F.3d 322, 329 (5th Cir. 2008)).  Additionally, to hold the County liable – and not just the individual Defendants – the Plaintiffs must show that the failure to train or supervise was done pursuant to an official custom or policy.  *Piotrowski*, 237 F.3d at 579.  The Fifth Circuit has indicated that a county government

may be held liable for the "inadequate training and supervision of its constables and deputy constables" if there is sufficient evidence on point. *See Keenan v. Tejada*, 290 F.3d 252, 263 (5th Cir. 2002).[13]  The question thus becomes whether the County has "inform[ed] the district court of the basis for its motion, and identif[ied] those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact" as to an essential element of the claim.  *Celotex*, 477 U.S. at 323.  If it has, Plaintiffs may defeat summary judgment if they can point to countering evidence which demonstrates a genuine issue of material fact.  *See* FED. R. CIV. P. 56(e).

### a.      Training

The County argues that it, and Gamboa, as Ramos's precinct commander, did not fail to train Ramos, by stressing the fact that Ramos was state certified and had accumulated over 3,000 hours of state-sponsored law-enforcement training by the time of the alleged incident.  *See* County S.J. Mot. ¶¶ 22-23 (citing to deposition and expert witness evidence).  The County thus articulates some basis for its Motion.  Plaintiffs responded to this argument by stating that neither

---

[13]      The Fifth Circuit has held that a constable is not a policy making authority, in the sense that a constable's decision in the line of duty is not directly attributable to the county as an "official policy" of the government.  *See Keenan*, 290 F.3d at 282-83 (citing *Rhode v. Denson*, 776 F.2d 107, 108-10 (5th Cir. 1985).  Thus, a constable's decision to effect an arrest in an unconstitutional manner does not give rise to automatic county liability, just like a decision by members of the rank-and-file of a municipal police force that violates a citizen's rights does not give rise to automatic municipal liability.  *See Rhode*, 776 F.2d at 108-10; *see also Pineda*, 291 F.3d at 328-30.  But that fact does not relieve the actual policy making authorities from their larger responsibilities to implement proper training supervision and hiring policies.  *See Piotrowski*, 237 F.3d at 579.  The County may therefore bear liability for inadequate training and supervision of deputy constables, even if it does not bear liability for each particular decision taken by a constable.  *See Keenan*, 290 F.3d at 263.

-31-

Gamboa nor anyone else in the Precinct 6 Constable's office provided "in-service" training to Ramos. Pls.' Resp. to County S.J. Mot. ¶¶ 26-28. This averment is supported by deposition testimony. *See* Ramos Dep. 81:6-83:22 (stating that the only training provided by the staff to new deputies at Precinct 6 was in the service of civil process). There is also some evidence that deputies in Precinct 6 were unable to make consistent use of the training opportunities provided by the county sheriff's office. *See* Ramos Dep. 82:25-83:25.

Plaintiffs' responses are not enough, however. In failure-to-train cases, the Fifth Circuit has created a burden-shifting test and has explicitly held that when police officers "have received training required by Texas law, the plaintiff must show that the legal minimum of training was inadequate." *Sanders-Burns v. City of Plano*, 594 F.3d 366, 382 (5th Cir. 2010). Given that Gamboa has provided evidence that Ramos had received adequate training under the state standards by the time he started work at Precinct 6, the burden is on Plaintiffs to explain how and why that training was inadequate. Plaintiffs fail to carry this burden. Plaintiffs do not delve into Ramos's training records to try to show that the course-work he completed was ill-suited to the duties he was assigned. They do not bring an expert witness who can render an educated opinion as to why the state standards were inadequate in his case. Nor do they attempt to dispute the conclusion that Ramos was, in fact, adequately trained under the state standards. Instead, they only stress the fact that Gamboa, as constable of Precinct 6, did not provide training through his department, and they read into his deposition testimony the inference that the training of the deputies was actionably insufficient. *See* Pls.' Resp. to County S.J. Mot. ¶ 26-28; *see also* Gamboa Dep. 129:16-21 ("I always feel the need for more training other than just the basics."). But, by hiring deputies who were already trained and already had previous law enforcement

experience, Gamboa managed to ensure that his staff was adequately trained, even though he did

not conduct the training himself.  *See* Gamboa Dep. 59:2-16.  Furthermore, an expressed

personal desire for more departmental training cannot, alone, counter the presumption afforded to

state certification by showing that the training levels were manifestly deficient; at most, they

suggest it was merely short of ideal.  *See Benavides v. County of Wilson*, 955 F.2d 968, 973 (5th

Cir. 1992) (holding that training inadequacies must be "obvious" and "likely to result in

violations of constitutional rights" in order to be actionable).  Accordingly, the Plaintiffs have not

carried their burden as to the failure-to-train theory, because they have not mustered enough

evidence, even when viewed in a light favorable to them, to show that Ramos was inadequately

trained.  Summary judgment is granted to the County on this point.

### b.    Supervision and discipline

The County argues that it did not fail to adequately supervise Ramos, contending that

"Plaintiffs point to no evidence where Defendants Gamboa or Juarez failed to supervise

[Ramos]."  County S.J. Mot. ¶ 25.  The County contends that Ramos's supervision was delegated

entirely to the Precinct 6 Constable's office, stating that other members of the Precinct 6 staff

were available to supervise Ramos when Gamboa himself was away from the office.  *Id.*

Plaintiffs respond by pointing to evidence showing that Gamboa was away from the office on an

unusually frequent basis due to external business interests, that he did not maintain an adequate

system of progressive discipline for his deputies, and that he made it unduly difficult for citizens

to complain of misconduct, which would impede the supervisory and disciplinary process.  Pls.'

Resp. to County S.J. Mot. ¶29; *see also* Pls.' Resp. to Gamboa & Juarez S.J. Mots. ¶¶ 12-14

(citing to deposition and affidavit evidence).

The Fifth Circuit has held that failure-to-supervise liability requires that "it at least must have been obvious that the highly predictable consequence of not supervising its officers was that they would apply force in such a way that the Fourth Amendment rights of citizens were at risk." *Peterson v. City of Fort Worth*, 588 F.3d 838, 850 (5th Cir. 2009) (internal citations and quotation marks omitted).  The Fifth Circuit has also stated that failure to take complaints and to discipline officers may give rise to municipal liability if there were policies of regularly ignoring complaints and failing to investigate alleged wrongdoing on the part of the officers.  *Piotrowski*, 237 F.3d at 581-82.

Plaintiffs' claims survive summary judgment on this point.  It is at least arguable, on the evidence already adduced, that Gamboa was unduly absent from his office, that the supervisory system he set up using his senior staff was inadequate, and that the only system for monitoring the use of force – the taking of citizen complaints by members of the Precinct 6 Constable's office at large – was run in a way which actively degraded its effectiveness for this purpose.  *See* Aff. of Hugo Sanchez, Mar. 10, 2010 ("Sanchez Aff.") (Doc. No. 85-1 Ex. G) (Citizen seeking to file a complaint regarding abuse by constables felt he was "given the runaround" and that it "was clear from the attitudes of the county employees, including the Constable 6 office[,] that no one wanted to take [a] complaint."); *see also* County S.J. Mot. ¶ 29 (citizen complaints had to be in writing and notarized before and internal investigation would be started).[14]  Moreover, Plaintiffs'

---

[14]    In *Peterson*, the Fifth Circuit discussed a municipality with a standing policy that requires officers who use force, or observe fellow officers using force, to make an internal report on each incident.  *Peterson*, 588 F.3d at 850.  The Fifth Circuit also observed that, while the self-reporting policy was violated in that case, a "thorough internal affairs investigation" was later conducted.  *Id.*  In the instant case, there is no evidence suggesting that Precinct 6 had any such self-reporting policy,

evidence suggests that the central County administration had constructive knowledge of, but turned a blind eye toward, the custom of lax discipline among the constables.  *See* Sanchez Aff. The apparent lack of a coordinated supervision system over the constables' offices is a deliberate policy choice on the part of the County – one with obvious negative consequences.  *See* Gamboa Dep. 123:10-25 (stating that, under County policy, complaints about constables were handled in the precinct offices, not centrally).  Where the need to take some action to control government actors is obvious, and the existing policies are non-existent or clearly inadequate, a failure to act can count as a deliberate and actionable municipal policy choice.  *See City of Canton v. Harris*, 489 U.S. 378, 390 (1989); *see also Keenan*, 290 F.3d at 263 (citing *City of Canton*).  Both Gamboa, as Ramos's supervisor, and the County, as the ultimate policy-making body, arguably failed to implement adequate supervision and discipline.

At this point, the Court need not hold that it is conclusively proved that it was "obvious that the highly predictable consequence" of these supervisory lapses was that Ramos would violate the Fourth Amendment rights of the Plaintiffs.  *See Peterson*, 588 F.3d at 850.  The Court holds, however, that the County has not shown that such a jury finding would be unreasonable, given the evidence already adduced.  *See Anderson*, 477 U.S. at 248 (holding that summary judgment is inappropriate "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party").  There is some evidence that the County had a policy of inadequately supervising the constables, and that the lax systems left in place at the precinct levels could

---

that Precinct 6 had any sort of internal affairs bureau, or that citizen complaints were routinely referred to a competent external body, such as the sheriff's department, for investigation.

predictably result in unchecked patterns of police brutality.  Under the Supreme Court's rule in *City of Canton*, where the need for municipal action to control police officers is "obvious," and the "inadequacy" of existing policy is "likely to result in the violation of constitutional rights" by those uncontrolled officers, governmental liability will attach.  489 U.S. at 390.  The evidence here at least plausibly meets this test, and so must go to a jury.  Accordingly, summary judgment in favor of the County is inappropriate as to the failure to supervise and discipline  theory.

### 6.        Inadequate hiring and retention

The County argues that Plaintiffs' claims sounding in inadequate hiring and retention should fail.  County S.J. Mot. ¶¶ 26-30.  Specifically, the County spends a good deal of time explaining the criteria and process that it did have in place to recruit and screen applicants for deputy constable positions.  *Id.* ¶ 27.  However, the County has not address Plaintiffs' arguments and evidence suggesting that these procedures were inadequate.  *See*, *e.g.*, Pls.' Resp. to County S.J. Mot. ¶ 32 (citing deposition evidence showing that Precinct 6, under Gamboa, moved away from an "oral board" interview process, which would have provided more opportunities to screen the finalist applicants than those afforded by the system actually used).

The Supreme Court has held that a municipality may be held liable under § 1983 for a single instance of inadequate screening upon the hiring of a new police officer, but that a court "must carefully test the link between the policymaker's inadequate decision and the particular injury alleged" in order to prevent hiring-decision liability "from collapsing into *respondeat superior*" liability.  *Bryan County*, 520 U.S. at 410.[15]  The key to this careful test is to ask

---

[15]        In the *Bryan County* opinion, the Supreme Court found that hiring decisions or hiring policies may be deemed municipal policies, and that inadequate background screening is a facially

whether "*this* officer was highly likely to inflict the *particular* injury suffered by the plaintiff." *Id*. at 412.  If there was ever a case that fit within such a rubric, this is it.

Plaintiffs bring copious evidence to showing that Defendant Ramos had accumulated a history of excessive force complaints before he was hired at Precinct 6.  *See, e.g.,* Villalobos Aff. (alleging that Ramos, when working as an officer for the Anthony Police Department, beat him without justification during a late-night traffic stop in 2007, in the presence of other officers, which resulted in a federal lawsuit); *see also* Ralph C. Kalma Aff. *and* Elizabeth Kalma Aff. (alleging that, in 2004, when working for the Socorro police department, Ramos violently dragged Ralph Kalma from a truck stop shower and beat him, in the presence of Elizabeth Kalma and Juarez, which led to a complaint to the local police chief and a federal lawsuit).[16]  Whether the policy-makers knew of these allegations and chose to ignore them, or whether they failed to

---

legal policy that can be made actionable only if implemented with deliberate indifference to the likelihood that an infringement on constitutional rights will result.  *Bryan County*, 520 U.S. 408-11.  As noted above, causation may be implied from predictability in such cases.  *Id.* at 410-11.  A policy decision requires a policy maker, and in the instant case, final hiring decisions for deputy constable positions are made by the County Commissioners Court, after selectees are nominated by the precinct constable.  *See* Gamboa Dep. 60:13-25; *see also* TEX. LOC. GOV'T CODE § 86.011(a).  Here, the Commissioners Court could be deemed a "rubber stamp," which would serve to impute any infirmities in Gamboa's selection process to the County, above any infirmities in the procedure used by the Commissioners Court itself to approve his nominations.  *See Murphy v. Butler*, 512 F. Supp. 2d 975, 990 (S.D. Tex. 2007) (finding the Harris County rubber-stamped deputy constable hiring decisions, allowing the actions and "tainted motivations" of the subordinate to be imputed to the "titular policymaker").

[16]   Juarez has claimed, under oath, never to have observed Ramos lose his temper.  *See* Noe Juarez Dep. 46:13-15, Oct. 28, 2009 (Doc. No. 85-3 Ex. M).  How to square this testimony with the Kalma affidavits is unclear.

make an adequate background investigation that would have revealed these incidents, is immaterial. The important question is whether the hiring authority, had it actually conducted an adequate investigation, "should have concluded that the [the applicant's] use of excessive force would be a plainly obvious consequence of the hiring decision." *Bryan County*, 520 U.S. 412-13.

In light of the evidence submitted by the Plaintiffs, a jury could reasonably conclude that, had the County undertaken an adequate investigation of Ramos's background, it would have learned the incidents discussed here, which were all witnessed by other local police offers, and which were made the subject of official complaints and federal lawsuits.[17] Moreover, a jury could easily conclude that, had the County learned of some or all of these incidents, it would have realized that "*this* officer was highly likely to inflict the *particular* injury suffered by the plaintiff." *Id*. at 412. The earlier allegations of misconduct leveled at Ramos bear an eerie similarity to the allegations in the instant case. In each case, an innocent person was allegedly beaten, without cause, during the course of a routine police patrol. Thus, Plaintiffs have submitted evidence supporting municipal liability for inadequate screening upon hiring, under the standards articulated by the Supreme Court in *Bryan County*. Summary judgment is thus inappropriate.

---

[17]     Because the incidents in question resulted in several official complaints and federal lawsuits, there is no need for expert witness testimony to establish the adequacy or inadequacy of the screening process employed. It is clear as a matter of law that an adequate screening would have involved inquiring into allegations of misbehavior that are part of the public record. *See Bryan County*, 520 U.S. at 411 (holding that an adequate screening of an applicant for a police job would have involved inquiring into the conduct underlying certain misdemeanor charges that appeared on the applicant's record).

Plaintiffs have added a separate allegation of wrongful retention of Ramos.  Pls.' Second Am. Compl. ¶ 26.  There is little in the way of case law which characterizes this theory or distinguishes it from the theories of inadequate supervision and discipline, or wrongful hiring. One purpose of this theory appears to be to highlight the fact that, shortly after being hired at Precinct 6 but before the incident at issue in the instant case, Ramos continued to rack up complaints of abuse bearing striking resemblance to the pattern of the prior complaints, which did not prompt a re-assessment of the decision to hire him or a move to fire him.[18]  *See* Linda George Aff. ("George Aff.") (Doc. No. 85-1 Ex. F); *see also* Sanchez Aff. (alleging that, on February 5, 2008, while working as a deputy constable, Defendant Ramos beat Sanchez and arrested him without probable cause inside a nightclub, after Sanchez came forward as a witness to an earlier altercation between two women; alleging also that Defendant Ramos violently assaulted and falsely arrested Linda George, Sanchez's sister, after she protested at the treatment being accorded her brother; a state-court lawsuit against Ramos ensued).  These facts and allegations should simply be considered together with the wrongful hiring and lack of supervision theories of liability.  For the foregoing reasons, the Court finds summary judgment in the County's favor on the wrongful hiring theory of liability inappropriate.

### C.      Arguments of Defendant Gamboa

Gamboa was the Constable for Precinct 6 in El Paso County during the relevant time periods and was thus responsible for hiring and supervising Mario Ramos.  He argues that

---

[18]          Texas state law makes it clear that the central county administration has "final policymaking authority . . . over the decision to demote, suspend or terminate" a deputy constable. *See Hurley v. Tarrant County*, 232 S.W.3d 781, 789 (Tex. Ct. App. 2007).

summary judgment in his favor is appropriate in connection with several of the § 1983 theories propounded by the Plaintiffs.  Most of his arguments track those of the County.  The discussion above therefore applies with equal force, subject to the observation that personal liability is easier to establish than municipal liability because it does not require a showing of an official custom or policy.  *See Brumfield*, 551 F.3d at 329.  Moreover, the Fifth Circuit has clearly established that indirect § 1983 theories, such as negligent training and supervision, can serve to create personal liability against the individual supervisors responsible and not just the responsible entity of local government.  *See Smith v. Packnett*, 339 F. App'x 389, 393 (5th Cir. 2009) (citing *Estate of Davis v. City of N. Richland Hills*, 406 F.3d 375, 381-82 (5th Cir. 2005)).  Because all theories of liability, except for failure to train, have survived summary judgment under the more stringent standards applicable to the County, the holdings described above apply with equal force to these individual-capacity defendants.  Accordingly, only Gamboa's unique arguments, surrounding his amenability to suit in a personal capacity, are addressed below.

### 1.       No personal involvement

Gamboa argues that, because he was not personally present at the scene of the incident involving Plaintiffs and Ramos, and because vicarious liability is not available for these sorts claims, he should not be held liable under § 1983.[19]  Gamboa S.J. Mot. ¶¶ 6-9.  The Court observes that Gamboa made essentially the same argument in his previously filed Motion to Dismiss.  *See* Def. Alex Gamboa's First Amended Mot. to Dismiss Pursuant to FRCP Rule

---

[19]       State law provides that the "constable is responsible for the official acts of each deputy of the constable."  TEX. LOC. GOV'T CODE § 86.011(c).  How to reconcile this rule with the requirements of § 1983, however, is unclear in this case.  *Cf. Brown v. Byer*, 870 F.2d 975, 977, 980-92 (5th Cir. 1989).

12(b)(6) and Local Rule CV-22 ("Gamboa 12(b)(6) Mot.") ¶¶ 5-6 (Doc. No. 36).  The Court found that the Plaintiffs had never even attempted to argue that Gamboa is "directly or vicariously liable for Plaintiffs' harms," but that Gamboa may be held personally liable under indirect theories of § 1983 liability, such as failure to train or failure to supervise.  *See* 12(b)(6) Order 14.  The Court held that the Plaintiffs had adequately set forth such alternative theories in their pleadings and allowed the case to proceed on that basis.  *Id.*  Why Gamboa feels the need to re-urge a point which has already been settled in his favor – this time bringing deposition testimony to prove that he was not present at the scene of the incident – is unfathomable.  *See* Gamboa S.J. Mot. ¶ 8 (citing evidence which proves that Gamboa was not at the scene of the incident).  The Court concludes that Gamboa's request for summary judgment on this point is moot because it addresses a theory of liability which is not being propounded by the Plaintiffs.

### 2.    Qualified immunity

Gamboa also seeks to avoid liability in his personal capacity by asserting the defense of qualified immunity.  Gamboa S.J. Mot. ¶¶ 18-19.  Seeking to invoke the defense of qualified immunity at the summary judgment stage is permitted.  *See, e.g.*, *Chishty v. Tex. Dep't of Aging and Disability Servs.*, 562 F. Supp. 2d 790, 801-02 (E.D. Tex. 2006).  But seeking to invoke the defense of qualified immunity at the summary judgment stage, using language and arguments that are perfectly identical to those considered and rejected by this Court mere months ago, at the motion to dismiss stage, is misguided.  *Compare* Gamboa 12(b)(6) Mot. ¶¶ 8-9 *with* Gamboa S.J. Mot. ¶¶ 18-19 (identical text); *see also* 12(b)(6) Order 14-16 (rejecting qualified immunity at the motion to dismiss stage).  Rejection of qualified immunity at the motion to dismiss stage does not automatically require a court to reject it at the summary judgment stage; instead, it stands to

reason that the chance to discover evidence may enable a positive finding that was simply not possible earlier.  But summary judgment requires the moving party to point to evidence in the record which would justify such a move.  *See Celotex*, 477 U.S. at 323.  Here, Gamboa has not made a single reference to the record.  *See* Gamboa S.J. Mot. ¶¶ 18-19.  Accordingly, given the fact that the Court has previously rejected his qualified immunity arguments, and given the fact that his re-urged qualified immunity arguments are identical to the rejected ones and cite no evidence in support of this defense, Gamboa is denied summary judgment on the qualified immunity point.

### D.   Arguments of Defendant Juarez

Defendant Juarez has also moved for summary judgment.  *See generally* Juarez S.J. Mot. His arguments are virtually identical to those put forward by Gamboa, including arguments concerning no personal involvement and qualified immunity.  *Id.*  Accordingly, the Court gives them identical treatment, subject to the observation that while Gamboa was the elected constable of Precinct 6, and thus the head of that office, Defendant Juarez was merely the second-in-command.  *See* Noe Juarez Dep. 17:5-7, Oct. 28, 2009 ("Juarez Dep.") (Doc. No. 85-3 Ex. M) ("Q.  If Alex Gamboa was not in the office, who was in charge of the office?  A.  I was.").  It would thus be reasonable to infer that Juarez took some part – and bears some responsibility – in the hiring, supervision, discipline and retention of Ramos, especially in light of the evidence that Gamboa was often out of the office.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (requiring a court to view all inferences drawn from the factual record in the light most favorable to the non-moving party on summary judgment); *see also* Juarez Dep. 12:23-17:4 (discussing Gamboa's outside interests and frequent absences from the office).

-42-

Moreover, the deposition evidence directly supports the proposition that Juarez took an active role in the management of the Precinct 6 officers.  He supervised the more senior officers who were assigned to work with Ramos and help him integrate into the precinct.  *See* Gamboa Dep. 171:5-15.  He was also put in charge of investigating citizen complaints.  *Id.* at 123:10-25 (Q. "Noe Juarez, he was in charge of – of taking complaints.  Is that right?  A.  Yes.").

While it is appropriate to deny summary judgment here, because the evidence plausibly suggests that Juarez was responsible for many of the decisions taken at the Precinct 6 office, Plaintiffs must demonstrate his particular involvement in decisions regarding Ramos in order to sustain personal liability at trial.  *See Goodman v. Harris County*, 571 F.3d 388, 394-95 (5th Cir. 2009) (holding that a law-enforcement supervisor may be held personally liable for failure to train a subordinate who goes on to violate the rights of a citizen).  The Court finds that while Juarez's rank was lower than Gamboa's and his participation in the decision-making process possibly reduced, there is enough evidence on record to make his degree of involvement in Ramos's hiring, retention, discipline and supervision a close factual question, which is properly reserved for the jury.

## III.   CONCLUSION

For the reasons set forth above, Defendants' Motions for Summary Judgment are **GRANTED** in part and **DENIED** in part.  The Court holds that Defendants have shown that there is no genuine issue of material fact as to the adequacy Plaintiffs' failure to train claims, and that Ramos' training is sufficient as a matter of law.  Defendants are not entitled to summary judgment on any of the other claims.

**SO ORDERED.**

-43-

**SIGNED** this 18th day of May 2010.

KATHLEEN CARDONE
UNITED STATES DISTRICT JUDGE